UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEMETONA TRADING LIMITED,<br>　　　　Plaintiff,<br>　　v.<br>KURT ORBAN PARTNERS, L.L.C.,<br>　　　　Defendant. | Case No. 14-cv-03284-SI<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO ENFORCE THE TERMS OF SETTLEMENT AGREEMENT**<br>Re: Dkt. No. 31 |

Before the Court is defendant Kurt Orban Partners, LLC's ("Orban") Motion to Enforce the Terms of the Settlement Agreement. Dkt. No. 31. Pursuant to Civil Local Rule 7-1(b), the Court finds this matter appropriate for resolution without oral argument and hereby VACATES the hearing. Having considered the arguments presented by the parties in the papers submitted to the Court, the Court hereby GRANTS the defendant's motion.

**BACKGROUND**

**I.    The Settlement Agreement**

The instant dispute arises from a Settlement Agreement that the parties executed on October 20, 2014. *See* Def.'s Mot. Enforce Settlement Agreement ("Def.'s Mot.") Ex. A. The Agreement aims to resolve the issues underlying the action before this Court, as well as a related lawsuit brought by Orban against Nemetona Trading Limited ("Nemetona") in Texas. *See id.* at 1.[1]

---

[1] Orban voluntarily dismissed its Texas action against Nemetona without prejudice in December 2014. *See* Order of Dismissal, *Kurt Orban Parters, LLC v. Nemetona Trading Limited*, 4:14-cv-02150 (S.D. Tex. Dec. 4, 2014), ECF No. 8.

Three transactions form the basis of the parties' lawsuits. The first is the sale or consignment of drill collars.[2] *See generally* Compl.; *see also* Counterclaim ¶¶ 7-13. The second relates to a series of purchase orders for pipe originating at the so-called TMK mill. Def.'s Mot. Ex. A, at 1. The final transaction relates to a cancelled order for drill collars from BMZ, a Belarusian pipe mill. *See id.*

The Settlement Agreement resolves these transactions as follows. Section one of the Agreement addresses the TMK pipe. *See id.* at 2. It requires Nemetona to make the pipe available for Orban to inspect within seven days of the Agreement's October 20, 2014 effective date. *Id.* Within two days of inspection, Orban is required under the Agreement to remit $39,000 to Nemetona. *Id.* Within five days of this payment, the Agreement requires Nemetona to release the pipe and transfer the title to the pipe to Orban without any restrictions or encumbrances. *Id.*

Section two addresses the BMZ pipe transaction. The section requires Orban and Nemetona to work toward the consummation of a sale of unspecified pipes from the BMZ mill. *See id.* To this point, Orban has paid $341,108.50 to Nemetona, though it appears that Orban has not received any of the pipe. *See id.* The section requires Orban to supply Nemetona with "[Orban]'s calculation of current market prices . . . for certain line pipe to be purchased by [Orban] . . . based on reasonable market data available to [Orban]." *Id.* This was to be done within three days of the Agreement's effective date, that is, by October 23, 2014. *See id.* After receiving Orban's pricing data, Nemetona was to submit "firm pricing for the BMZ Products . . . based on BMZ's pricing . . . and reasonable transportation charges." *See id.* The parties then had three days after Orban received Nemetona's price information to agree on a mutually acceptable price for the BMZ products. *See id.* The Agreement then required Orban to submit a purchase order to Nemetona within three days of arriving at an agreed price, and required Nemetona to accept the purchase order within five days of the order's issuance "if the material terms are acceptable to [Nemetona]." *Id.* at 3. The Agreement does not say what would happen if Nemetona found the material terms unacceptable. *See id.* The payment provisions of this section provide that Orban's

---

[2] Drill collars are steel tubes used in the process of oil drilling.

2

advance payment of $341,108.50 would be applied to the total purchase price of the BMZ products. *See id.* at 3-4.

Section three addresses the drill collar transaction. There are three sizes of drill collars at issue: 6.5-inch, 4.75-inch, and 8.25-inch. *Id.* at 4. The Agreement states that Nemetona shall have no further claims relating to the 6.5-inch drill collars. *See id.* It sets the amount due for the 4.75-inch and 8.25-inch drill collars at $214,700 and $246,400, respectively, for total price of $461,100 due to Nemetona. *See id.* The Agreement further requires Orban to pay Nemetona a sum of $119,991.50 for the collars within three days of the Agreement's October 20, 2014 effective date. *See id.* This would leave a balance of $341,108.50 due to Nemetona from Orban, which was to be paid upon shipment of the BMZ products. *See id.* In the meantime, the Agreement allows Orban to sell the drill collars at its sole discretion, and to retain the proceeds therefrom. *See id.*

Section seven of the agreement requires the parties to dismiss their respective lawsuits with prejudice upon the fulfillment of certain conditions precedent. *Id.* at 6. These conditions are: (1) Nemetona's making the TMK pipe available for inspection; (2) Orban's payment of $39,000 to Nemetona under the Agreement provisions related to the TMK pipe; (3) Nemetona's transfer of the TMK pipe to Orban; and (4) Orban's payment of $119,991.50 to Nemetona under the Agreement's provisions related to the drill collars. *Id.* at 2, 4, 7.

In sum, the Agreement contemplated speedy resolution of the TMK pipe transaction. *See id.* at 2. The drill collar transaction was structured to allow Orban to accrue a benefit of $314,108.50 to match Orban's advance BMZ payment, which was being held by Nemetona. *See id.* at 2-4. This allowed each party to hold an equivalent amount to ensure performance of the BMZ transaction. *See id.* The amount held by Nemetona was to be applied toward the purchase of the BMZ pipes, and the amount held by Orban would be paid to Nemetona upon delivery of the BMZ pipes. *See id.* Once the TMK transaction was completed and the parties each held an equal security, the lawsuits were to be dismissed as the parties negotiated the BMZ transaction. *See id.* at 2, 4, 7.

## II. Course of Performance After Execution of the Settlement Agreement

### A. TMK Pipes

Orban complied with its obligation to remit $119,991.50 to Nemetona within three days of the Agreement's execution. *See id.* Ex. C. That same day, a representative from Orban notified Nemetona that it was ready to inspect the TMK pipe, and asked when the order could be "segregated, and laid out for [Orban's] inspection team." Pl.'s Opp. Mot. Enforce Settlement Agreement ("Pl.'s Opp.") Ex. A, at 1. Minutes later, a Nemetona representative responded: "I'm working on it. This is the first time I am hearing about laying them out and/or segregation. Nothing of the sort was mentioned in the Settlement Agreement. I must make pipe available for inspection. That's all. I will advise you [sic] the dates shortly." *Id.* at 2. Orban promptly responded that it could not inspect the order "if it's on top of a pile of pipe."

The next email on the record was sent from Nemetona to Orban on October 31, 2014. *Id.* Ex. B at 4-5. In this message, Nemetona stated that Orban's request that the TMK pipes be segregated and laid out was "extra work that has never been agreed or fixed in the Agreement and was not in the contracts." *Id.* at 5. Nemetona added that it was communicating with the TMK mill in order to get them to accommodate Orban's request as a sign of good will, but that Nemetona would need more time. *Id.* Orban responded two days later. *Id.* at 3. Orban noted that the last time it was allowed to inspect pipes, it was "pointed to a mountain of pipes to inspect and given no clarity as to which [were] the pipes covered in the release/contract." *Id.* Orban stated that inspection would not be possible if the pipes were not laid out. *Id.*

On November 3, 2014, counsel for Orban sent an email to counsel for Nemetona, noting that Nemetona had not made the TMK pipe available for inspection within the seven-day period required by the Settlement Agreement. Def.'s Reply Ex. M. Orban requested that it be advised when the pipe will be made available for inspection. *Id.* On November 5, 2014, Nemetona responded by blaming the delay on Orban's request to lay out the pipe. *Id.* Ex. N. Nemetona further stated that it would reveal the location of the pipes and make them available for inspection only if Orban confirms it will inspect them "as is, where is" and bear all costs for the inspection. *Id.* The next day, Nemetona sent a further email stating that it would notify Orban that the

4

inspection is ready to occur as soon as Orban acknowledged its understanding that Orban will bear all costs associated with the inspection. *Id.* Ex. P, at 2. On November 10, 2014, Orban complied with this condition by notifying Nemetona that it was prepared to bear the inspection costs and had never stated or implied otherwise. *Id.*

The next email in the record is dated November 17, 2014. In it, Nemetona stated that Orban must meet two further conditions before Nemetona would provide the name and contact information for the yard where the pipe was being stored. *Id.* Ex. O, at 3. First, Nemetona demanded that Orban acknowledge that it would inspect the pipe in accordance with the yard's practice and the Settlement Agreement. *Id.* This included the yard's policy not to lay out the pipe until it is loaded on the buyer's transport. *Id.* Second, Nemetona demanded that Orban supply Nemetona with data supporting its price quotes related to the BMZ transaction, or else agree to Nemetona's quoted prices. *Id.* On November 26, Orban sent a message to Nemetona protesting the new conditions as "debatable," but agreed that Orban would conduct the inspection in accordance with the yard's policies and the Settlement Agreement. *Id.* at 2-3. He further agreed to provide Nemetona with the requested data within 24 hours of Nemetona's providing the information needed for the inspection to proceed. *Id.* Orban supplied the requested data on November 28, 2014, despite not having received the inspection information from Nemetona. *Id.* Ex. R, at 2-3. The data was apparently not acceptable to Nemetona. *See id.* Ex. Q, at 3-4.

It appears that Nemetona refused to allow inspection as late as January 14, 2015, the last time the inspection was mentioned in the record. *See* Def.'s Mot. Ex. D, at 2. Nevertheless, Orban wired $39,000 to Nemetona on January 15, 2014, in fulfillment of its last remaining obligation under section one of the Settlement Agreement. *Id.* Ex. B; *id.* Ex. A, at 2. In wiring the $39,000 payment to Nemetona, Orban fulfilled all conditions precedent to Nemetona's releasing the TMK pipe, and both parties' dismissing their respective lawsuits with prejudice. *See id.* Ex. A, at 2, 4, 7.

### B. BMZ Transaction

The Settlement Agreement required Orban to provide its calculation of current market prices to Nemetona within three days of the Settlement Agreement's effective date. *Id.* Ex. A, at 2.

1   These prices were to be based on "reasonable market data available to [Orban]." *Id.* Nemetona
2   had five days after receiving Orban's price calculation to supply Orban with its firm pricing. *Id.*
3   Nemetona's pricing was to be based on BMZ mill's pricing and reasonable transportation charges.
4   *Id.* After Nemetona submitted its pricing, the parties had three days to come to a mutually
5   agreeable price, after which Orban was to submit a purchase order to Nemetona for the
6   transaction. *Id.*

7   Orban submitted its price information to Nemetona on October 20, 2014, the day the
8   Settlement Agreement became effective. Def.'s Reply Ex. P, at 2. While the exact date of
9   Nemetona's transmission of price data to Orban is not in the record, it appears that Nemetona sent
10  its pricing info no later than October 31, 2014. *See* Pl.'s Opp. Ex. A, at 4 (email dated October 31,
11  2014, discussing Nemetona's prior price quote). In its October 31 email, Nemetona complained
12  that the data Orban provided to support its prices was insufficient. *Id.* at 4. On November 2,
13  2014, Orban responded with an email explaining why its data supported its quoted prices, and why
14  the data made Nemetona's pricing "unworkable." *Id.* at 1. Orban offered to execute a purchase
15  order if Nemetona would agree to a price of $1,130 per metric ton. *Id.*

16  Though there is no further direct communication between the parties about the BMZ
17  pricing, their respective attorneys continued to discuss the issue. In short, Nemetona maintained
18  that Orban had not provided sufficient information to Nemetona to support its pricing, and Orban
19  continued to assert that it was not contractually required to provide that information. *See, e.g.*,
20  Def.'s Reply Ex. P, at 2 (Nemetona: "The prices quoted by [Orban] on October 20 are simply
21  numbers in an e-mail, unsupported by any evidence whatever . . . ."); *id.* Ex. Q, at 2 (Orban:
22  "While Nemetona can certainly allege that [Orban] had an obligation to provide market
23  information on the BMZ transaction, [it has] yet to cite a single provision of the Settlement
24  Agreement that places such a requirement on [Orban].").

25  As mentioned above, Orban did agree to provide the requested information on November
26  25, 2014, and did so three days later. *Id.* Ex. O, at 3; *id.* Ex. R, at 3. On November 28, 2014,
27  Nemetona again said the provided information was deficient and asked whether Orban would
28  accept a price of $1,200 per metric ton. *Id.* Ex. R, at 2. The message indicated that the offer

would be good only until December 2, 2014. *Id.* The next email in the record was sent from Orban on December 4, 2014. *Id.* Ex. Q, at 1. It reiterated that Orban was not required to provide market information, and noted that Nemetona had refused to provide the basis for its pricing information even as it sought to obtain that information from Orban. *Id.* at 2. However, Orban added that further discussion of price was irrelevant, as the parties had agreed on a price — presumably $1,200, as mentioned in Nemetona's prior email. *Id.* It is unclear whether Orban had communicated its acceptance of Nemetona's offer on or before the deadline of December 2, 2014. Orban sent purchase orders for the BMZ transaction to Nemetona on December 9, 2014. *See id.* at 1.

### C. Subsequent Activity

The email records the parties have provided contain a month-long gap after December 9, 2014. Communications resume on January 13, 2015, with counsel for both parties discussing a stipulation to vacate a hearing on the motion to dismiss that Nemetona filed on November 24, 2014. Def.'s Mot. Ex. I, at 4.[3] Over the next three weeks, Orban inquired about the status of Nemetona's release of the TMK pipes, and about dismissal of the parties' actions. *See id.*, Ex. I, 1-2. Nemetona repeatedly said it would respond shortly. *Id.* at 1-2. Having received no response by February 4, 2015, Orban notified Nemetona that it would file a motion with this Court to seek enforcement of the Settlement Agreement. *Id.* at 1. The next day, Nemetona sent an email confirming that it had received Orban's $39,000 payment, alleging that Orban had breached the Settlement Agreement, and refusing to dismiss the litigation until Orban acceded to a list of new demands. *Id.* Ex. J, at 1-2.

Nemetona claimed that Orban materially breached the contract in three ways. *Id.* at 2. First, by making its $119,991.50 payment one day late.[4] *Id.* Second, by insisting that the TMK

---

[3] Nemetona filed a motion to vacate the hearing on January 14, 2015. Dkt. No. 29. This Court granted the motion the following day. Dkt. No. 30.

[4] The record indicates that this allegation is false, and Nemetona has abandoned it. *See* Def.'s Mot. Ex. C; Pl.'s Opp. at 3-5.

7

pipe be segregated, which led to a one-month delay. *Id.* Finally, by failing to include market data in its price calculations. *Id.*

On February 6, 2014, Orban filed a motion to enforce the terms of the Settlement Agreement. Dkt. No. 31. Orban alleges that it has fulfilled all of its obligations that are required for Nemetona to release the TMK pipe and for the dismissal of the underlying lawsuits. Def.'s Mot. at 4. Nonetheless, Orban argues, Nemetona continues to refuse to release the TMK pipe and dismiss the lawsuit even though Nemetona has retained all payments made by Orban. *Id.* Orban asks this Court to order Nemetona to release the TMK pipe and dismiss its lawsuit in accordance with the Settlement Agreement.

## LEGAL STANDARD

District courts have the inherent and equitable power to enforce Settlement Agreements in cases pending before them. *In re City Equities Anaheim, Ltd.*, 22 F.3d 954, 957 (9th Cir. 1994); *Callie v. Near*, 829 F.2d 888, 890 (9th Cir. 1987). The court's enforcement power includes authority to award either damages or specific performance. *T.N.T. Mktg., Inc. v. Agresti*, 796 F.2d 276, 278 (9th Cir. 1986).

"The construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally." *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989); *see also Gates v. Rowland*, 39 F.3d 1439, 1444 (9th Cir. 1994). In California, the words of a contract, as understood in their ordinary and popular sense, govern the contract's interpretation if the language is clear. Cal. Civ. Code §§ 1638, 1641. While the Court must interpret a contract so as to give effect to the mutual intention of the parties, "the intention of the parties is to be ascertained from the writing alone, if possible." *Id.* at §§ 1636, 1639; *see also Titan Grp., Inc. v. Sonoma Valley Cnty. Sanitation Dist.*, 164 Cal. App. 3d 1122, 1127 (1985) ("It is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation."). "The parties' undisclosed intent or understanding is irrelevant to contract interpretation." *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 956 (2003).

8

## DISCUSSION

Nemetona does not dispute that it has failed to perform its obligations under the Settlement Agreement provisions related to TMK pipe. *See generally* Pl.'s Opp. However, Nemetona argues that two material breaches on the part of Orban excused its performance. *Id.* at 3-4. First, Nemetona alleges that Orban breached the Agreement by imposing what it felt were "costly and unwarranted" conditions on the inspection of TMK pipe. *See id.* at 3. Second, Nemetona alleges that Orban's conclusory statement that Nemetona's BMZ product pricing was "not workable" violated the Agreement's purported requirement that pricing evaluations be based on reasonable market data. *See id.* However, the plain terms of the Settlement Agreement reveal that Nemetona, not Orban, is in breach.

### I.   TMK Pipe Inspection

The provision of the Settlement Agreement at issue here reads as follows: "As promptly as practical after the Effective Date, but not to exceed seven (7) business days, [Nemetona] shall make available for inspection by [Orban] the balance of the TMK Pipe ordered under [Orban Purchase Order] Nos. 010323 and 010333 (the '*Remaining TMK Pipe*')." Def.'s Mot. Ex. A at 2. Nemetona states that it failed to comply with this provision because Orban "demanded that the TMK Pipe be 'segregated, and laid out' prior to inspection." Pl.'s Opp. at 3. Without reasoning or support, Nemetona states that this request "contravene[d] standard industry practice and [was] not required under the Agreement." Pl.'s Opp. at 3.

The parties' email records outlined above make it clear that Orban's request was simply that their TMK pipe order be segregated from pipe that was not part of the order. In other words, Orban wanted to inspect *its own* pipes, rather than a "mountain of pipes" which might or might not be the ones it would receive. *See* Pl.'s Opp. Ex. A, at 1. Whether or not this request was "costly," it was not "unwarranted." *See* Pl.'s Opp. at 3. The Settlement Agreement unambiguously refers to *a specific quantity of pipe* ordered under *specific purchase orders*. Def.'s Mot. Ex. A, at 2 ("[Nemetona] shall make available by [Orban] *the balance of* the TMK Pipe, *ordered under*

9

[*Orban*] *P.O. Nos. 010323 and 010333* . . . .") (emphasis added). Thus, if the TMK pipe were "on top of a pile of pipe," as Orban feared, the correct pipe would need to be "segregated, and laid out" for inspection in order to meet the clear language of the Settlement Agreement. *See* Pl.'s Opp. Ex. A; Def.'s Mot. Ex. A, at 2; *see also* Cal. Civ. Code. § 1638.

Further, Nemetona's complaints about cost fail for several reasons. *See* Pl.'s Opp. at 2. First, the Settlement Agreement already implied that Orban was to bear the cost of inspection. The portion of the Settlement Agreement related to the BMZ transaction contains inspection provisions substantially similar to those related to the TMK pipes. *See* Def.'s Mot. Ex. A, at 3 ("The BMZ Products will be made available for inspection by [Orban] . . . in order to confirm that the BMZ Products comply with the [Orban's specifications]."). Provision 2(b)(ix) states that Nemetona shall bear the cost of inspection only if more than three inspections are required. *See id.* Given that the provisions of section two demonstrate an understanding that Orban would pay for inspections, there is no reason to suspect that the parties intended a different arrangement with respect to inspection in section one of the Agreement in the absence of an express provision. *See id.* at 2-3; *see also* Cal. Civ. Code § 1641 ("The whole contract is to be taken together . . . each clause helping to interpret the other."). If there had been any ambiguity in the Agreement, Orban resolved it when it explicitly agreed to bear the cost of the inspection. *See* Def.'s Mot. Ex. O, at 3.

Second, in spite of promising to allow the inspection once Orban acknowledged its responsibility for payment, *see id.* Ex. P, at 2, Nemetona refused to allow the inspection well after Orban provided the requested assurance. *See id.* Ex. O, at 3. Instead, Nemetona withheld the needed information, using it as a bargaining chip to pressure Orban to comply with two additional demands. *See id.* Specifically, Nemetona demanded that Orban carry out the inspection in accordance with the yard's practices, which included a policy not to segregate or lay out the pipes. *Id.* If the cost complaint had not been moot once Orban acknowledged its responsibility for inspection costs, it certainly became so once Nemetona told Orban — several weeks after it was supposed to make the pipe available — that it would not proceed unless Orban abandoned its segregation request. *See id.*

Nemetona further demanded that Orban supply evidence supporting the price quotes it

1   provided for the BMZ transaction. *Id.* However, the provision of this information was not a
2   condition precedent to making the pipe available for inspection; the pipe should have been made
3   available on Nemetona's own initiative three weeks earlier. *See id.* Ex. A, at 2-3. In fact, and
4   contrary to Nemetona's apparent belief, the Agreement did not require either party to provide such
5   information *at all*. *See id.* Ex. P, at 2. The provision Nemetona repeatedly referenced as
6   supporting the would-be condition reads as follows: "[Orban] . . . will provide [Orban]'s
7   calculation of current market prices . . . to [Nemetona] based on reasonable market data available
8   to [Orban]." *See id.* at 2. The Agreement, then, requires Orban to provide *prices* to Nemetona,
9   and it further requires that the prices be based on reasonable market data. *See id.* Nowhere does
10  the Agreement require Orban to provide the data itself. *See id.*

11  In sum, the Settlement Agreement and communications on record reveal that Nemetona
12  withheld the inspection of the TMK Pipes without justification. At each turn, it used the pipes as
13  leverage to pressure Orban to comply with additional terms that had no basis in the Agreement.
14  Even if there were legitimate concerns about the cost and burden of segregating the pipes,
15  Nemetona made no attempt to make the pipe available in accordance with its own understanding
16  of the Agreement. Nemetona was thus in breach and without excuse for nonperformance of its
17  obligations to make the pipe available, and to release it to Orban after receiving the $39,000
18  payment.

19

20  **II.    BMZ Transaction Pricing**

21  Nemetona next argues that Orban was in breach because Orban failed to base its contention
22  that Nemetona's pricing was "not workable" on reasonable market data, and that Orban failed to
23  provide the data despite repeated requests. Pl.'s Opp. at 4. This argument is weaker than the
24  previous one.

25  First, as discussed above, the Agreement imposed no obligation on Orban to provide
26  Nemetona with any data other than prices. *See* Def.'s Mot. Ex. A, at 2. Second, Orban was only
27  required to rely on reasonable market data in its initial price quote to Nemetona. *See id.* The
28  record confirms that this initial quote was transmitted on October 20, 2014. *See id.* Ex. P, at 2.

11

1   Orban stated that Nemetona's prices were "not workable" in an email of November 2, 2014, after
2   receiving Nemetona's responsive pricing.  *See* Pl.'s Opp. Ex. B, at 1.  Orban's latter statement falls
3   under provision 2(b)(iii) of the Agreement, which provides:  "Within three (3) business days after
4   the date of Y. Lasytsya's advice of the [Nemetona] Prices, the parties shall agree on a mutually
5   acceptable price for the BMZ Products (the "*Agreed Price*")."  *See* Def.'s Mot. Ex. A, at 2.  That is
6   the entirety of the provision, and it contains no requirement that price negotiations at this stage
7   must include — or even rely upon — market data of any sort.  *See id.*

8   If the argument is that Orban did not rely on reasonable market data for its initial price
9   quote under provision 2(b)(i), Nemetona has not provided any factual or legal support for its
10  position.  *See* Pl.'s Opp. at 4.  In its brief, declaration, and exhibits, Nemetona points only to
11  Orban's "not workable" statement which, as shown above, did not fall under the provision
12  requiring market data.  *See id.*; *id.* Decl. of Yaroslavna Lasytsya; *id.* Ex. B, at 1.  This fails to
13  demonstrate either that Orban was in breach of the Agreement, or that Nemetona was excused
14  from further performance of the contract.

15  Finally, the TMK and BMZ transactions are completely independent under the Settlement
16  Agreement.  *See* Def.'s Mot. Ex. A, at 2-3.  The BMZ transaction is not conditioned upon the
17  performance of any other portion of the Agreement, nor is any other portion of the agreement
18  conditioned on performance of the BMZ transaction.  *See generally id.*  Under section one, there is
19  no condition precedent to Nemetona's obligation to make the TMK pipe available for inspection.
20  *See id.* at 2.  Its obligation to release the pipe is conditioned only on Orban's payment of $39,000.
21  *See id.*  Under section seven, dismissal of the parties' lawsuits is conditioned on performance of
22  section one, and on a payment by Orban of $119,991.50.  *See id.* at 6.  The obligation to dismiss
23  the lawsuits is completely independent of any portion of the BMZ transaction. *See id.* at 2-4, 6.

24  Orban asks this Court to enforce sections one and seven of the Settlement Agreement.
25  Def.'s Mot. at 8. Orban has demonstrated that it has performed each of its obligations necessary to
26  trigger Nemetona's duty to release the TMK pipe and for the parties to dismiss their lawsuits.
27  Nemetona does not dispute that Orban has so performed, or that it has failed to perform its own
28  obligations under these sections. Nemetona's protestations about Orban's failure to perform under

the BMZ transaction provisions are not only baseless, they are also irrelevant. Orban is not seeking to enforce the provisions of section two. *See id.* at 861 ("If there is an uncured material failure by either party, he can claim compensation for any parts that he has already performed, but he cannot enforce the contract with respect to any other pair of corresponding parts . . . ."). Accordingly, the Court finds it appropriate to GRANT Orban's motion to enforce the Settlement Agreement.

## CONCLUSION

For the reasons stated above, the Court GRANTs Orban's motion to enforce the Settlement Agreement. Nemetona is hereby **ORDERED** to release the TMK Pipe to Orban in accordance with section one of the Settlement Agreement. Both parties are **ORDERED** to dismiss their respective actions with prejudice in accordance with section seven of the Settlement Agreement. Nemetona's motion to dismiss plaintiff's counterclaims is therefore **DENIED** as moot. The Case Management Conference scheduled for March 13, 2015 is **VACATED**. This order resolves Docket Nos. 22, 31.

**IT IS SO ORDERED.**

Dated: March 11, 2015

_____
SUSAN ILLSTON
United States District Judge